## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **JULIA TAYLOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 4:11CV 193 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Julia Taylor for Disability Insurance Benefits under Title II of the Social Security Act, and Supplemental Security Income under Title XVI of the Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff has filed a Brief in Support of the Complaint.  (Document Number 15).  Defendant has filed a Brief in Support of the Answer.  (Doc. No. 18).

## Procedural History

On June 19, 2007, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on December 22, 2001.  (Tr. 97-113).  This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated September 30, 2009.  (Tr. 61-65,

13-20).  On December 16, 2010, the Appeals Council denied plaintiff's request for review.  (Tr.

1-5).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  <u>See</u> 20

C.F.R. §§ 404.981, 416.1481.

<strong><u>Evidence Before the ALJ</u></strong>

**A.      <u>ALJ Hearing</u>**

Plaintiff's initial administrative hearing was held on July 28, 2009.  (Tr. 23).  Plaintiff was

present and was represented by counsel.  (<u>Id.</u>).  Also present was vocational expert Delores E.

Gonzales.  (<u>Id.</u>).

The ALJ examined plaintiff, who testified that she was married and had four children.  (Tr.

26).  Plaintiff stated that two of her children lived with her, and that they were aged eighteen and

seven.  (Tr. 27).  Plaintiff testified that the children who do not live with her were aged twenty-six

and twenty.  (<u>Id.</u>).  Plaintiff stated that her eighteen-year-old daughter recently finished high

school and planned to attend trade school.  (<u>Id.</u>).  Plaintiff testified that her seven-year-old son

was out of school for the summer.  (<u>Id.</u>).

Plaintiff stated that she was fifty years of age, and lived in a two-story home with a

basement.  (Tr. 28).  Plaintiff testified that her bedroom was on the main level, and the laundry

room was in the basement.  (Tr. 30).

Plaintiff stated that she graduated from high school.  (<u>Id.</u>).

Plaintiff testified that she was five-feet, two-inches tall, and weighed 175 pounds.  (<u>Id.</u>).

Plaintiff stated that she had difficulty reading.  (<u>Id.</u>).  Plaintiff testified that she tries to read

books with her son.  (<u>Id.</u>).  Plaintiff stated that she was able to do simple arithmetic and make

change at the grocery store.  (Tr. 29).  Plaintiff testified that she was able to write her name, but

- 2 -

she needed help spelling words, and completing forms.  (Id.).  Plaintiff stated that she did not

write notes for her son's school.  (Tr. 31).

Plaintiff testified that her husband was legally blind.  (Id.).  Plaintiff stated that her

husband was able to shop with assistance.  (Id.).

Plaintiff testified that her eighteen-year-old daughter was not working.  (Tr. 32).  Plaintiff

stated that the household's source of income was her husband's disability benefits, and her

husband's blind pension.  (Id.).  Plaintiff testified that she did not receive Medicaid benefits or

food stamps.  (Id.).

Plaintiff stated that she last worked in November of 2001 at L&W Learning Center as a

daycare worker.  (Id.).  Plaintiff testified that this was the only position she had in the past fifteen

years.  (Tr. 33).  Plaintiff stated that she cared for infants at the daycare.  (Id.).

Plaintiff testified that she stopped working because she was pregnant and suffered a

stroke.  (Id.).  Plaintiff stated that a doctor told her she had suffered two strokes, but she did not

remember the doctor's name.  (Id.).  The ALJ noted that he did not see any medical evidence in

the record indicating that plaintiff had suffered a stroke, other than plaintiff's own reports.  (Tr.

34).  Plaintiff's attorney indicated that he would attempt to obtain additional medical evidence.

(Id.).

Plaintiff testified that she did not work from 1983 through 1993 because she was raising a

family.  (Tr. 35).

Plaintiff stated that her vision was blurry.  (Tr. 36).  Plaintiff testified that she was barely

able to see at times.  (Id.).  Plaintiff stated that she was able to see well enough to lead her

husband into the hearing room and negotiate around chairs and tables.  (Id.).  Plaintiff testified

that her sister drove her to the hearing.  (Id.).

Plaintiff stated that she was able to do housework, including cleaning, making beds, and laundry, with assistance.  (Tr. 37).  Plaintiff testified that her kids help her with household chores.  (Id.).  Plaintiff stated that her kids sort clothes and fold them.  (Id.).  Plaintiff testified that she has to go downstairs in order to do laundry.  (Id.).  Plaintiff stated that she cooks "country" meals, such as collard greens, sweet potatoes, and fried potatoes.  (Tr. 38).  Plaintiff testified that her family helps her cook.  (Id.).

Plaintiff stated that she tries to attend church on Tuesdays, Fridays, and Sundays.  (Id.).  Plaintiff testified that she was able to read the Bible, although it was somewhat blurry.  (Tr. 39).

Plaintiff stated that the vision in her right eye was worse than the vision in her left eye.  (Id.).  Plaintiff testified that she was able to see the colors of pens the ALJ was holding during the hearing.  (Id.).

Plaintiff stated that her medication made her drowsy.  (Tr. 40).

Plaintiff testified that she has diabetes.  (Id.).  Plaintiff stated that she takes insulin twice a day, and she takes a pill.  (Id.).  Plaintiff testified that she injects the insulin into her stomach.  (Id.).  Plaintiff stated that her son helps her with the insulin shots.  (Id.).  Plaintiff testified that she measures the insulin and draws it into the syringe.  (Tr. 41).

Plaintiff stated that she also has high blood pressure.  (Id.).  Plaintiff testified that she takes medication for her high blood pressure, and that her blood pressure still fluctuates.  (Id.).  Plaintiff stated that her doctor has talked to her about her diet.  (Id.).

Plaintiff testified that she also has "a little trouble" with her left leg.  (Tr. 42).  Plaintiff acknowledged that she did not claim this as an impairment.  (Id.).

Plaintiff testified that her blood pressure medication made her drowsy. (Id.). Plaintiff stated that she takes six to seven pills in the morning and four to five pills around bedtime. (Id.).

Plaintiff testified that she was able to take care of her personal hygiene, prepare breakfast, walk her son to school, dust furniture, iron clothes, watch television, and play games with her family. (Tr. 42-43). Plaintiff stated that she throws a football around outside with her family. (Id.). Plaintiff testified that she tries to do outdoor activities with her son. (Id.). Plaintiff stated that she cooks, washes dishes by hand, and does laundry. (Tr. 44).

Plaintiff testified that she enjoyed going to the movies with her husband and kids. (Id.). Plaintiff stated that it had been a while since she last went to the movies. (Tr. 45). Plaintiff testified that she watched movies at home. (Id.).

Plaintiff stated that she was able to stand long enough to prepare a meal. (Id.). Plaintiff testified that she was able to sit ten to fifteen minutes. (Tr. 46). Plaintiff stated that she had difficulty bending, and that she was unable to touch her toes. (Id.). Plaintiff testified that she had no difficulty lifting. (Id.). Plaintiff stated that she had no difficulty walking, and that she walks her son to the bus stop. (Tr. 47).

Plaintiff's attorney examined plaintiff, who testified that she started experiencing problems with her left leg sometime after May 2007. (Tr. 48). Plaintiff stated that she experiences pain in her left leg, into her hip and lower back. (Id.). Plaintiff testified that this pain is aggravated when she lifts heavy items, such as a laundry basket full of clothes. (Tr. 49). Plaintiff stated that she becomes aggravated when she reads because she is unable to read well enough to help her son with homework. (Id.). Plaintiff testified that reading has always been a problem for her. (Id.).

Plaintiff stated that she had a stroke in May of 2007. (Tr. 50). Plaintiff testified that she

had a second stroke, but she did not remember when this occurred.  (Id.).

Plaintiff stated that she had never discussed neuropathy[1] with her doctor.  (Id.).

Plaintiff testified that she had no difficulty with buttons or zippers.  (Id.).

The ALJ next examined vocational expert Delores Gonzalez, who testified that plaintiff's past work as a daycare worker was classified as light and semi-skilled.  (Tr. 52).  Ms. Gonzalez stated that plaintiff had not acquired any skills that could be utilized in other jobs.  (Id.).

The ALJ asked Ms. Gonzalez to assume a hypothetical claimant with the following limitations: no exertional limitations; limitations in visual acuity, but the claimant is able to see small items from a distance of about six feet, able to identify and negotiate rooms, and able to cook.  (Tr. 52-53).  Ms. Gonzalez testified that the claimant could perform plaintiff's past work.  (Tr. 53).

The ALJ next asked Ms. Gonzalez to assume the same limitations with the additional limitation of only light work.  (Id.).  Ms. Gonzalez testified that the claimant could still perform plaintiff's past work.  (Id.).

Plaintiff's attorney then questioned Ms. Gonzalez, who testified that a claimant would be unable to work competitively if she were incapable of completing an eight-hour workday due to symptoms of fatigue and lack of concentration from suffering a stroke.  (Tr. 53-54).

Ms. Gonzalez stated that the position of daycare worker required only occasional near vision, far vision, depth perception, color vision, and field of vision.  (Tr. 54).

The ALJ indicated that he would leave the record open for thirty days so that plaintiff

---

[1]A generic term for any diabetes mellitus-related disorder of the peripheral nervous system, autonomic nervous system, and some cranial nerves.  Stedman's Medical Dictionary, 1313 (28th Ed. 2006).

could submit medical evidence regarding her stroke.  (Id.).

**B.    Relevant Medical Records**

The record reveals that plaintiff was admitted at Forest Park Hospital on June 10, 2002, for small bowel obstruction.  (Tr. 216).  Plaintiff underwent an emergency exploratory laparotomy,[2] and then a partial small bowel resection and adhesiolysis.[3]  (Id.).  It was noted that plaintiff's hypertension was increased due to the stress of surgery.  (Tr. 217).  Plaintiff was discharged on June 20, 2002, at which time she was limited to lifting no more than fifteen pounds until cleared by a physician.  (Id.).

Plaintiff presented to Saint Louis County Department of Health on November 17, 2004, with complaints of high blood pressure.  (Tr. 338).  It was noted that plaintiff needed refills on blood pressure medication.  (Id.).  Plaintiff's blood pressure was 160/84.  (Tr. 339).  Plaintiff's physical examination revealed no abnormalities.  (Tr. 339-40).  Plaintiff was diagnosed with hypertension.  (Tr. 340).  Nifedipine[4] was prescribed.  (Id.).

Plaintiff presented to St. Louis Connect Care on November 9, 2006, with complaints of headache.  (Tr. 275).  Plaintiff indicated that she had been out of blood pressure medication for one week.  (Tr. 275).  Plaintiff's blood pressure was 223/105.  (Id.).  Plaintiff was diagnosed with hypertensive urgency.  (Tr. 276).  Plaintiff was prescribed medication and instructed to return if her symptoms worsened.  (Id.).

---

[2]Incision into the loin.  Stedman's at 1048.

[3]Severing of adhesive bands.  Stedman's at 29.

[4]Nifedipine is indicated for the treatment of chest pain.  See WebMD, http://www.webmd.com/drugs (last visited March 22, 2012).

Plaintiff presented to the Department of Health for a follow-up on December 11, 2006, at which time plaintiff's blood pressure was 230/106.  (Tr. 336).  Plaintiff was diagnosed with hypertension, and was prescribed Atenolol,[5] Hydrochlorothiazide,[6] Enalapril Maleate,[7] and aspirin.  (Tr. 337).

Plaintiff presented to the Department of Health on March 30, 2007, for a routine follow-up.  (Tr. 330).  Plaintiff's blood pressure was elevated at 167/83.  (Id.).  Plaintiff reported that she had been taking her medications.  (Id.).  Plaintiff was diagnosed with hypertension, anemia,[8] and hypercholesterolemia.[9]  (Tr. 331).

Plaintiff presented to Saint Louis Connect Care on May 16, 2007, with complaints of feeling lightheaded, pain in the left side of her face for three days, blurriness in her right eye for three days, weakness when walking, and occasional slurred speech.  (Tr. 267).  It was noted that plaintiff had a history of stroke in 1998 on the left side.  (Id.).  Plaintiff's blood pressure was 166/80.  (Tr. 268).  Plaintiff was diagnosed with transient ischemic attack,[10] and was transported

---

[5]Atenolol is indicated for the treatment of hypertension.  See WebMD, http://www.webmd.com/drugs (last visited March 22, 2012).

[6]Hydrochlorothiazide is indicated for the treatment of hypertension.  See WebMD, http://www.webmd.com/drugs (last visited March 22, 2012).

[7] Enalapril Maleate is indicated for the treatment of hypertension.  See WebMD, http://www.webmd.com/drugs (last visited March 22, 2012).

[8]Any condition in which the number of red blood cells, the amount of hemoglobin in blood, and/or the volume of packed red blood cells of blood are less than normal.  Stedman's at 78.

[9]The presence of an abnormally large amount of cholesterol in the blood.  Stedman's at 918.

[10]A sudden focal loss of neurologic function with complete recovery usually within 24 hours.  Stedman's at 181.

to Barnes Jewish Hospital via ambulance.  (Tr. 269).

Plaintiff underwent a head CT at Barnes Jewish Hospital on May 16, 2007, which revealed ischemic changes in the deep white matter.  (Tr. 272).  An MRI was recommended.  (Id.). Plaintiff was diagnosed with hypertension, diabetes mellitus,[11] and headache.  (Id.).  Plaintiff underwent an MRI on May 17, 2007, which was consistent with a subacute stroke.[12]  (Tr. 304). Plaintiff's initial symptoms of slurred speech and left arm weakness resolved on their own.  (Id.). Plaintiff's headache was caused by acute sinusitis.  (Id.).  Plaintiff was discharged on May 20, 2007, with diagnoses of diabetes mellitus type II,[13] subacute stroke, and sinusitis.  (Id.).

Plaintiff presented to the Department of Health on May 29, 2007, at which time she complained of fatigue and decreased vision in the right eye since the onset of her stroke.  (Tr. 488).  It was noted that plaintiff was able to perform her activities of daily living independently, including meal preparation, shopping, housekeeping, transportation, and social activities.  (Id.). Plaintiff's blood pressure was 170/90.  (Id.).  Plaintiff's affect was flat, her speech was stammering, and her short-term memory was impaired.  (Id.).  On May 31, 2007, plaintiff presented with complaints of significant memory loss since her stroke.  (Tr. 325).  Plaintiff's blood pressure was 177/88.  (Id.).  Plaintiff was diagnosed with uncontrolled type II diabetes

---

[11]A chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced.  It is caused by an absolute or relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, water and electrolyte loss, ketoacidosis, and coma.  Stedman's at 529.

[12]A stroke is defined as any acute clinical event, related to impairment of cerebral circulation, that lasts longer than 24 hours.  Stedman's at 1849.

[13]Type II diabetes mellitus is characterized by insulin resistance in peripheral tissues as well as a defect in insulin secretion by beta cells.  Stedman's at 529.

mellitus; late effects of cerebrovascular disease,[14] hemiplegia[15] affecting unspecified side; and benign hypertension.[16]  (Tr. 327).  Plaintiff presented for a follow-up regarding her diabetes on June 11, 2007.  (Tr. 323).  Plaintiff was diagnosed with uncontrolled type II diabetes mellitus.  (Tr. 324).  Plaintiff's medications were adjusted.  (Id.).  On June 13, 2007, plaintiff presented for a diabetic eye examination.  (Tr. 320).  Plaintiff was diagnosed with uncontrolled type II diabetes mellitus, esotropia,[17] astigmatism,[18]and presbyopia.[19]  (Tr. 322).  Plaintiff was cautioned regarding driving.  (Id.).

Plaintiff saw Riaz A. Naseer, M.D. for a neurologic examination on August 25, 2007.  (Tr. 341-43).  Plaintiff complained of high blood pressure, stroke, and Bell's Palsy.[20]  (Tr. 341).  Plaintiff's blood pressure was 168/88.  (Id.).  Upon examination, plaintiff talked rather slowly, but

---

[14]General term for a brain dysfunction caused by an abnormality of the cerebral blood supply.  Stedman's at 553.

[15]Paralysis of one side of the body.  Stedman's at 866.

[16]Hypertension that runs a relatively long and symptomless course.  Stedman's at 927.

[17]Misalignment of the eyes inward.  See Stedman's at 671.

[18]A condition of unequal curvatures along the different meridians in one or more of the refractive surfaces of the eye.  Stedman's at 170.

[19]The physiologic loss of accommodation in the eyes in advancing age.  Stedman's at 1556.

[20]Paralysis, usually unilateral, of the facial muscles, caused by dysfunction of the seventh cranial nerve.  Stedman's at 1408.

her speech was not dysphasic,[21] or dysarthric.[22]  (Id.).  Plaintiff was able to understand and respond appropriately.  (Id.).  Plaintiff's fields of vision were full in all four quadrants.  (Id.).  On covered and uncovered testing, plaintiff's left eye tended to deviate medially.  (Id.).  Plaintiff's motor examination revealed her to have no drift to one or the other side, but her deep tendon reflexes were definitely brisk on the left as compared to the right.  (Id.).  Plaintiff's gait was normal, and she was able to ambulate independently without assistive device.  (Id.).  Dr. Naseer's impression was history of esotropia since early childhood; status post stroke affecting the left side of the body, with hyperreflexia[23] of the left as compared to the right noted on examination, but otherwise no motor deficit; right-sided visual acuity is down to 20/100, as compared to 20/70 in the left eye; controlled hypertension; and diabetes.  (Id.).

Plaintiff presented to the neurology clinic at Saint Louis Connect Care on October 5, 2007, at which time plaintiff's blood pressure was 200/106.  (Tr. 374).  Plaintiff was diagnosed with hypertensive urgency, and was directed to the urgent care clinic.  (Tr. 374).  At the urgent care clinic, examination revealed abnormal bradycardia,[24] heart murmur, and bilateral swelling of the feet.  (Tr. 366).  Plaintiff was diagnosed with hypertension, and it was recommended that plaintiff be transferred to another hospital.  (Id.).

---

[21]Impairment in the production of speech and failure to arrange words in an understandable way; caused by an acquired lesion of the brain.  Stedman's at 599.

[22]A disturbance of speech due to emotional stress, to brain injury, or to paralysis.  Stedman's at 595.

[23]Exaggeration of the deep tendon reflexes; may be generalized, regional, or focal.  Stedman's a 926.

[24]Slowness of the heartbeat.  Stedman's at 249.

Plaintiff presented to the Department of Health on October 18, 2007, with concerns about elevated blood pressure. (Tr. 448). Plaintiff's symptoms had been associated with mild obesity and stroke; while her symptoms were not associated with visual disturbances, fatigue, or dizziness. (Id.). It was also noted that plaintiff had no visual changes, fatigue, hypoglycemic episodes, numbness/tingling in extremities or pain in her extremities associated with her diabetes. (Id.). Plaintiff's blood pressure was 160/94. (Id.). Plaintiff was diagnosed with benign hypertension and type II diabetes mellitus without mention of complication. (Tr. 449).

Plaintiff returned for follow-up on December 13, 2007, at which time it was noted that plaintiff was compliant with blood pressure medications without side effects. (Tr. 444). Plaintiff had no new complaints. (Id.). Plaintiff presented for follow-up on February 29, 2008, at which time her blood pressure was extremely elevated at 190/99. (Tr. 439). Plaintiff reported that she was compliant with her medications. (Id.). Plaintiff presented for follow-up on April 25, 2008, at which time her blood pressure was 187/83. (Tr. 433). Plaintiff reported that she had started an exercise program at church, and was power walking daily. (Id.). Plaintiff was diagnosed with type II diabetes mellitus without mention of complication, benign hypertension, late effects of cerebrovascular disease, medication-induced bradycardia, and hypercholesterolemia. (Tr. 434). Plaintiff presented for her annual diabetic eye examination on May 21, 2008, at which time she was diagnosed with esotropia. (Tr. 428). Plaintiff presented for follow-up on May 23, 2008, at which time her blood pressure was 168/78. (Tr. 424). It was noted that plaintiff's blood pressure was still uncontrolled, although it had improved. (Tr. 425). Plaintiff presented for follow-up on May 27, 2008, at which time plaintiff complained of sluggishness and fatigue. (Tr. 422).

Plaintiff's blood pressure was 148/80. (Id.). It was noted that plaintiff's blood pressure had

significantly improved, and that plaintiff had only been taking an increased dosage of

Hydralazine[25] for one day, so no additional improvement was noted. (Id.). Plaintiff's

sluggishness was attributed to an inconsistency in plaintiff's at home Atenolol dose. (Id.). On

June 30, 2008, plaintiff reported feeling sluggish despite her Atenolol dosage being decreased.

(Tr. 414). Plaintiff's medications were adjusted, and she was counseled on the importance of

compliance with her diet. (Tr. 415). On September 29, 2008, plaintiff presented for follow-up, at

which time her blood pressure was 124/63. (Tr. 399).

     A summary from the Department of Health reveals that plaintiff presented for regular

follow-ups regarding her diabetes and hypertension January 2009 through June 2009. (Tr. 531-

32).


### The ALJ's Determination

The ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2006.

2.     The claimant has not engaged in substantial gainful activity since December 22, 2001, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: diabetes mellitus, hypertension, residuals of stroke, limited vision acuity (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and

---

[25]Hydralazine is indicated for the treatment of hypertension. See WebMD, http://www.webmd.com/drugs (last visited March 22, 2012).

416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for tasks requiring fine visual acuity but with the ability to see items on a table, recognize ink pens from 6 feet away, identify and negotiate rooms, and cook.

6.      The claimant is capable of performing past relevant work as a daycare worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from December 22, 2001 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 15-20).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on June 19, 2007, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on June 19, 2007, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 20).

## Discussion

### A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from

- 14 -

the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. <u>See</u> <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. <u>See</u> <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." <u>Burress v. Apfel</u>, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." <u>Id.</u>

**B.     The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. <u>See</u> <u>Ingram v. Chater</u>, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); <u>Fines v. Apfel</u>, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. <u>See</u> 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the

impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

C.    **Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity.

Plaintiff also argues that the hypothetical question posed to the vocational expert was erroneous.

The undersigned will discuss plaintiff's claims in turn.

The ALJ made the following determination regarding plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for tasks requiring fine visual acuity but with the ability to see items on a table, recognize ink pens from 6 feet away, identify and negotiate rooms, and cook.

(Tr. 17).

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).  In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147.  The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC.  Id.  As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'"  Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001)).  The ALJ

is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Plaintiff claims that the ALJ pointed to no medical evidence in support of his decision. Plaintiff further argues that the ALJ relied on the opinion of a non-examining lay person.

In determining plaintiff's RFC, the ALJ first performed a proper credibility analysis and determined the plaintiff's subjective complaints were not entirely credible.  (Tr. 18-19).  The ALJ found that plaintiff's daily activities were inconsistent with her complaints of symptoms precluding all types of work.  (Tr. 18).  Specifically, the ALJ pointed out that plaintiff leads a "very active lifestyle," preparing meals for family, walking her son to school, cleaning, caring for  her blind husband, using public transportation or walking, shopping for groceries, visiting with relatives, and attending church.  (Id.).  Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).

 The ALJ also found that the medical record did not support plaintiff's subjective allegations. (Tr. 19).  Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility.  See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).  The ALJ first noted that, although plaintiff alleged Bell's palsy, no such diagnosis was found in the record.  (Tr. 19).  The ALJ next pointed out that plaintiff has large gaps in treatment.  (Id.).  This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability.  See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).  Finally, the ALJ noted that no doctor has indicated that plaintiff is disabled or unable to work.  (Tr. 19).  The fact that an examining physician did not "submit a medical

conclusion that she is disabled and unable to perform any type of work" is a significant factor for the ALJ to consider.  Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000).

After determining plaintiff's credibility, the ALJ stated that "medical consultants with the State disability determination service" made assessments regarding the nature and severity of plaintiff's impairments, and concluded that plaintiff may have some trouble with depth perception, but such would not constitute a significant restriction of her ability to function and was deemed non-severe. (Tr. 19).  The ALJ stated that these findings were part of the record, and were "considered expert opinion on the issue of the claimant's medical capabilities and limitations."  (Id.).  The ALJ cited Social Security Ruling 96-6p in support of this finding.  (Id.).

Plaintiff contends that the ALJ cited non-medical evidence in support of his RFC determination, in violation of Dewey v. Astrue, 509 F.3d 447 (8th Cir. 2007).  The assessment of the "medical consultant" cited by the ALJ was an "Explanation of Determination" completed by Charles Hermann, a "Disability Examiner" with no medical credentials listed.  (Tr. 60).  As such, it appears that Mr. Hermann is a lay Disability Examiner rather than a "medical consultant."

In Dewey, the ALJ discredited the opinion of the claimant's treating physician and relied on the findings of a Residual Functional Capacity Assessment conducted by a lay person, who the ALJ erroneously believed was a physician.  509 F.3d at 449-50.  The Eighth Circuit held that the ALJ erred in weighing the opinion of the lay person as though it had been authored by a physician.  (Id.). The court found that the error was not harmless because absent the mistake, the ALJ would have been less likely to disregard the more restrictive opinion of the claimant's treating physician, and the ALJ may have reached a different conclusion.  (Id.).

In this case, as in Dewey, the ALJ erroneously weighed the opinion of Mr. Hermann, a lay

- 19 -

person, under the rules appropriate for weighing the opinion of a medical consultant. (Tr. 19). Defendant acknowledges this error, but contends that it was harmless because the ALJ did not rely on the opinion of Mr. Hermann. Defendant points out that Mr. Hermann found that plaintiff did not have a severe impairment, while the ALJ found that plaintiff's diabetes, hypertension, residuals from a stroke, and limited vision acuity were severe. (Tr. 59-60, 15).

In this case, the only assessment in the record before the ALJ regarding plaintiff's functional abilities is the opinion of Mr. Hermann. The ALJ found that plaintiff's diabetes, hypertension, residuals from a stroke, and limited vision acuity were severe impairments, yet none of plaintiff's treating physicians expressed an opinion regarding plaintiff's ability to work with her impairments. "A treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting [an] ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment." Pate-Fires v. Astrue, 564 F.3d 935, 943 (8th Cir. 2009). The undersigned cannot say with any degree of certainty that the ALJ's error was harmless, as there was no other medical opinion evidence with regard to plaintiff's functional abilities. As such, the court believes the better course is to reverse the ALJ's decision and remand for assessment of plaintiff's RFC by a medical source.

The residual functional capacity must be based on some medical evidence; if there is no such evidence, the residual functional capacity "cannot be said to be supported by substantial evidence." Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995). An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Here, the ALJ's RFC determination

fails <u>Lauer</u>'s test that the residual functional capacity be supported by *some* medical evidence.  <u>See</u> <u>Lauer</u>, 245 F.3d at 703.

Plaintiff also argues that the hypothetical question posed to the vocational expert was erroneous.  The hypothetical question posed to the vocational expert was based on the ALJ's  RFC determination, which the undersigned has found is not supported by substantial evidence.  As, such the vocational expert's response was not based on substantial evidence.

## Conclusion

In sum, although the ALJ gave some valid reasons for not fully crediting plaintiff's subjective allegations of pain and limitation, the ALJ erred in determining plaintiff's residual functional capacity. The ALJ weighed the opinion of a lay person as if it were the opinion of a medical source, and assessed a residual functional capacity that was not supported by any medical evidence.  For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to obtain medical evidence  addressing  plaintiff's  ability  to  function  in  the  workplace  with  her  impairments;  and formulate a new residual functional capacity for plaintiff based on the medical evidence in the record. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.


Dated this  _26th_  day of March, 2012.



_Lewis M. Blanton_
_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE


- 21 -